Case number 23-1267, SSM Litigation Group Petitioner v. Environmental Protection Agency. Mr. Frey for the petitioner, Mr. Durkee for the respondent. Good morning. May it please the court? Good morning. Russell Frey on behalf of Petitioner SSM Litigation Group, and I would like to reserve two minutes for rebuttal. Over 30 years ago, and actually consistent with the position EPA had taken for decades before that, EPA determined it was appropriate and permissible to include in Title V operating permits under the Clean Air Act of Provision, allowing sources to exercise an affirmative defense to liability for emissions that were unavoidable with the use of the technology that they are required to use. They still couldn't meet the limitation during a period of emergency. And more than three-quarters of the states agreed that that was an appropriate thing to do and adopted that provision into their state programs. Then in 2023, EPA reversed course. And actually, it reversed course a couple times before that, but where we are now is that the agency said that no affirmative defenses are permissible, and therefore, states have to remove the provisions in their state permitting programs, and they have to remove affirmative defenses from operating permits that have been issued. Now, that wasn't based on any new facts. Before we go too far down the road of the merits, can we talk about standing for a bit? Certainly. To know if there's Article III injury here, don't we need to know that at least one member of the associations and your association operated in a state that had the affirmative defense before the EPA revoked it? That would be a necessary element of determining that this particular group has standing. However, as I said, three-quarters of the states have these provisions, so they're pervasive, and they apply to tens of thousands of sources, so any source that emits over 100 tons per year of any gluten or over 10 tons per year of hazardous air pollutant or is subject to emission standards for new sources, all those facilities have to have. It should have been fairly easy then in your opening brief to submit an affidavit from one of those thousands of sources. It would have been easy, I guess, but I don't think it's required by the court's rules. I do know that the court just proposed to amend Section 28 to require that, even if standing is apparent from the record. But even in your reply brief, neither of the two declarations say what I think you just admitted needs to be said, which is, here's a factory, name the factory. In a state, name the state that had the affirmative defense. I think the declaration of Mr. Hunt says that American Forest and Paper Association has members that are in states that have adopted. Name a member. Name a state. Not now. I think now is too late. I really just don't understand why the declarations were an improvement over the opening brief, but I think the declaration could have just been one sentence. It could have been, there's a factory called the, you know, Wichita, Topeka, Atchison factory. It's located in Wichita, and Kansas has an affirmative defense. But it's not there, even in the reply brief. Well, Your Honor, I don't understand why the declaration of the person in charge of air pollution issues for the Trade Association's statement that members are located in states that have affirmative defenses, and they have affirmative defense. I mean, I think there's a formal reason that I've tried to spell out, but I also think there's maybe a somewhat pragmatic reason, and that is what you've given is something that, if false, the respondent cannot disprove. So if you said we have a factory in Topeka and Kansas has an affirmative defense, the government could go look up whether Kansas has an affirmative defense, and they could probably find out if you have a factory in Topeka. But if you just say we have members in states with affirmative defenses, there's, you know, if that, I'm not saying it is false, but if that were false, I think there's no way the government could disprove it. And, you know, it's kind of like doing a summary judgment phase here, where we're deciding facts that either are or aren't disputed. I just think it's a – to be honest, I more or less trust you, I think, in the declarance, but, you know, you can imagine a case where someone just alleges these things, it's not true, and because of lack of specificity, the opposing party can't disprove it. Yes, I can imagine that, Your Honor, but I don't think that's the case here. I mean, this is a coalition, an organization that's specifically formed in order to address the way EPA deals with emissions during startup shutdown malfunction, these types of situations, that's already litigated this almost analogous issue of whether affirmative defenses are permissible in state implementation plans. I did litigate that case very thoroughly. You were here. And I was here, and you were here, too. There's no question that there's a case for controversy here. There's no question that this organization, the SSM litigation group, it wouldn't have been formal. There's no question that emitters in 40 states or so have been injured. But I'm just not sure that you've shown that your members are among them. We don't know who your members are. Well, if this were – I called the court's attention to the American Trucking case that was discussed in our reply brief on page 7, and there the court said this is an association, American Trucking Association, formed to protect the interests of its members in the trucking industry, and so it's obvious that it has an interest in protecting or challenging regulations. In that case, it was the Federal Motor Carrier Safety Administration that adversely affected trucking. Are trucks in all states injured? Here there are 10 states where there's no injury. And I know you might think, well, 80% sounds like a pretty high probability of injury. We heard oral arguments a few weeks ago that the case has not been decided. I'm not saying how it will be decided, but one of the strong arguments there was that these were – the plaintiffs had been impressed into labor on chocolate factories in Africa, and then they were suing American chocolate companies, and there was a 70% chance that the chocolate companies had bought chocolate from the individual factory – sorry, the individual plantation where a particular plaintiff worked. But they couldn't really show that Chocolate Factory had bought from anyone who had bought from that plantation. And so the argument was 70% chance is not good enough. Here it sounds like there's sort of an 80% chance. Again, I think obviously EPA – let me, with all due respect, offer a different perspective, and that is what is the point of this? There's no question that – I mean, what constitutional purpose is being or would be achieved by saying an organization that's specifically formed to challenge this kind of government regulation – Usually we ask the minister, but I'm happy to answer. But then I have one more question, then I'm going to stop, and I'm going to either let you move on to marriage or let my colleagues pick up with marriage questions or standing questions. I think we can't give advisory opinions, so we need a case of controversy. In order to assure that, we have our rules. We also have the Sierra Club precedent, and it's to make sure that you are representing – even though we can be certain that some people have been injured, it's to make sure that the people before us have been injured. And it seems like that would have been quite easy to show if you just included one sentence. But usually it's a little harder if you're not the regulated party. Here you purport to be a regulated party, so it should have been very easy. And so my question to you, my last question, is why didn't you just put one sentence in a declaration that says, here's the name of the factory, here's the state it is in, and that state has affirmative? So there's a legal reason and a practical reason, I think. Some of the case law that discusses this question, this court's case law, says that requiring information beyond what's in the administrative record is something that isn't necessary in all cases in order to avoid filling up the court's docket or head, whatever. The administrative record here doesn't include any of this information about standing, does it, in terms of the specific facilities that are regulated? Well, it does include the fact that thousands and thousands of permits in three-quarters of the states that apply to a wide range of manufacturing facilities that are adversely affected or that have the potential to have excess emissions from emergencies, all that is in the record. I just have one question about how do you get around the Twin Rivers decision from 2019 by the circuit in terms of standing? Their parties didn't submit information about standing in their opening brief, they did submit some information in reply, and the court said that was not sufficient, that they failed to meet their burden. Well, but in that case, I think that case was very different because that was what the court described as a vaguely described non-profit that was challenging SEC regulations that were directed not to that non-profit or its members, but to other people that regulated corporations. And so there wasn't direct connection. Here we're talking not about some third party coming in and saying, hey, we don't like what EPA has done to industrial facilities. We have industrial facilities coming in and say, here are the reasons why this adversely affects us and is not appropriate. Let me just return, because I didn't say the practical reason, and that is in part because these organizations are somewhat fluid. And so a trade association may say, and these things, as you know, can carry on for years and years and years. And at the beginning, one group says, OK, we're willing to put money into this. And then somewhere along the line, they say, we don't have any budget. We're going to drop out. So there is a fluidity to it. But they're paying money because their members believe they're adversely affected by this rule. That's the whole purpose for this entity. So I do think consistent with the court's precedent, maybe not consistent with the new rule that's going to be, circuit rule that's been proposed, but consistent with the court's precedent and the current circuit rule, I think we have done what was required. And we are, again, under the court's precedent. And the American Libraries Association case, among others, said it is appropriate to respond to questions about standing through declarations provided in the reply. So, yeah, back to the merits. Let me just say that, first of all, EPA's action was based on, again, not on any new information or new policy reasons, but on its conclusion that it was required to get rid of the affirmative defense in the Title V regulations because of this court's 2014 NRDC decision. And EPA also said it will be consistent now with the way we're handling affirmative defenses in state implementation plans. Well, both of those things have changed, and yet EPA still wants the court to uphold its action rather than remand it. The court in that SSM zip call case made a distinction between affirmative defenses, like the one in Arkansas, that apply to liability in general, and affirmative defenses that the court said fall in a different category, that conflict with the PAC's allocation of the responsibility for setting penalties to the district courts. And those are affirmative defenses that just deal with penalties. In Florida Electric, it was at least theoretically possible for a SIP to not include an emission limitation. We read the statute did not require it. Here, is it possible for a Title V permit to not include an emission limitation? I think it may be possible, but in the Florida Electric case, the question of whether SIP had to have emission limitations was an issue that was relevant to other provisions, but it wasn't relevant to the question of whether an affirmative defense was acceptable. So, for example, the court upheld EPA's issuance of SIP calls to states that had affirmative defense provisions that applied just to penalties. Despite the fact that there wasn't any discussion of whether that affirmative defense went to or was involved in a SIP that had to have emission limitations in it or not, that was a different issue. The statute here says a Title V permit shall include emission limitations. So, it certainly reads like you can't get a permit unless the permit has emission limitations. I think you should assume that Title V permits have emission limitations. Okay, and that they are required to have emissions. Should we assume that? It says shall include. I'm not sure, but it doesn't matter, so I'll accept that. Okay, well, then if the Title V permit has to include an emission limitation, and in Sierra Club 2, the general duty exception didn't count as a continuous emission limitation, why do these affirmative defenses count as continuous emission limitations? In other words, I guess my question is what's the difference between the general duty exceptions in Sierra Club 2 and the affirmative defenses here? Okay, I understand the question, and I think it's inherent in the nature of an affirmative defense. Affirmative defense is something where the defendant acknowledges noncompliance with a limitation of some sort, and yet asserts a defense that excuses that, and that is different from an exemption. The issues in the Sierra Club case, that general provision was something that said, anytime there's emissions associated with a startup shutdown or malfunction, then the emission limitation that would otherwise apply doesn't apply. That isn't what the affirmative defense does. I think the other thing I would say is that this court now has the duty to determine what's the best reading of the statute, and EPA's reading of the statute is that unless a source can be penalized for exceeding some numerical limit as a result of an emergency and a failure of the technology that the source had through no fault of their own, despite the source's proper installation and use of technology nevertheless succeeding, unless the source can be penalized for that, then the source is not subject to an emission limitation. That's not really a logical or a grammatical. I think you have a potentially strong argument about the practical effects of what EPA has done here, and I think you may also have a potentially strong argument about the meaning of the text if Sierra Club 2 weren't precedent, but you said our duty is to interpret the precedent, which is true enough, but we have to interpret the precedent in a way that does not overrule Sierra Club 2, which binds us. I think the best way for you to win without us overruling Sierra Club 2, which we can't do, is to show that the general duty of Sierra Club 2, which required minimizing emissions, is somehow different than the affirmative defense condition here, which requires minimizing excess emissions. That seems like slicing salami or anything. Well, first of all, EPA acknowledges that the statute doesn't say anything about whether a Title V permit can contain affirmative defense or not. The definition of emission limitation that was interpreted in the Sierra Club case was interpreted in conjunction with Section 112 of the Clean Air Act, and there's no such conjunction here. There is a distinction between affirmative defense and a regulatory exemption, and EPA, in this action, up until the court's decision last year, EPA's position was this affirmative defense does not modify the emission limitations in any way. EPA specifically said that. It's quoted in our brief. So EPA's position was this is affirmative defense. It's not acceptable because it conflicts with court's responsibility to determine penalties, but it also doesn't modify the emission limitation in any way. So I think that EPA statement is consistent with the nature of affirmative defense. It's consistent with the language of the affirmative defense, which doesn't say emission limitations don't apply. What do we do about Florida Electric, which says that an affirmative defense is an exemption? Well, even assuming I agree with you that generally in an affirmative defense, an exemption are two very different legal concepts. The Florida Electric court says an affirmative defense is an exemption. I mean, is that only for the purposes of the NRDC rationale? Why would it be limited only to the NRDC rationale? It says a Florida defense functions as an exemption, and it concluded that the states could have affirmative defenses in their SIFs that apply to liability generally and not to penalties. So I don't see the conflict. And again, regardless of the precedent on a different issue, there is no precedent that directly applies to Title V permits or to affirmative defenses in Title V permits. And again, EPA itself, its stated reason is we believe that this affirmative defense doesn't change in the emission limitation, but it does interfere with the district court's ability to determine penalties. In the Florida Electric case, the court decided, well, that's not true if the affirmative defense applies to all liability and not just the affirmative defense. So it doesn't infringe on the judicial power, but if an affirmative defense is an exemption, then it runs into the Sierra Club problem. Doesn't it? Or why doesn't it? Well, first of all, I would say I don't think the court needs to get to that point, because you have to review EPA's action on the basis that EPA stated. And although EPA says that it now has a different understanding of the way things work, the understanding that is stated in the preamble to the proposed and final rules is inconsistent with Florida Electric. And I think the case needs to be remanded for that reason in any event. But in terms of inconsistency with the Sierra Club decision and the definition of an emission limitation as being something that limits emissions on a continuous basis, again, I think there's a very clear distinction between a generic exemption that says emission limitations for hazardous air pollutants don't apply if they're exceeded because of startup shutdown or malfunction, and this affirmative defense for emergencies, which is narrow and which doesn't say these limitations don't apply. To the contrary, it says you have a defense if you violate, if you exceeded this limitation, which does apply. So the two are very different situations. And again, I think the court has to evaluate whether it's a reasonable reading of the statute to say something is not an emission. These sources that have Title V permits with the affirmative defense provision are not subject to emission limitations, just because on rare occasions if there's an emergency that causes an exceedance, they won't be subject to liability. And I think the other thing that we need to consider when interpreting the statute is the legislative history. Legislative history was on a continuous basis was added specifically to deal with situations where facilities were using intermittent controls, that they only operated certain times during certain conditions. No one would say that a facility with a Title V permit that has an affirmative defense provision doesn't have continuous, isn't operating continuous controls just because if there happens to be an emergency that causes that emission limitation to be exceeded, the source won't be penalized for that. Can I just make sure I have your answer on this question? The material difference between minimizing excess emissions and minimizing emissions. This case involves a condition about minimizing excess emissions. SARE Club 2's general duty, if I recall, involved minimizing emissions. Your position, I think, is it your position that there's not much of a material difference in any between minimizing excess emissions and minimizing emissions? Well, I think there is a difference, but as it was implemented, there wasn't really a difference because there was also a policy that said there's no requirement to reduce emissions beyond what the permit allows. You don't have to go – just because you had a malfunction, you don't have to reduce emissions lower than what you're permitted to admit, so I think functionally they're the same. Functionally the same, and there's not a legally material difference that would affect the outcome of this case. Is that fair? Between reducing emissions and reducing excess emissions. Yes, but I'm not sure why you're focusing on the part of the affirmative defense that requires facilities to reduce excess emissions because that's one of many conditions, numerous conditions, to successfully asserting the affirmative defense, but it's not an essential – it's not the function of the affirmative defense to require excess emissions. The function of the affirmative defense is to recognize, and this only applies to technology-based limitations, to recognize that Congress intended certain limitations under the Clean Air Act to be based on what can be accomplished with available technology, and if that available technology, through no fault of the facility, can't meet the limitation due to an emergency, then that shouldn't be penalized. That's contrary to the intent of technology-based emission limitations. That's the fundamental nature of it. Are there any emissions limitations for technology-based settings that derive from someplace other than 7411 or 7421? Yes, John, there are. So, for example, state implementation plans, in order to make sure that ambient air quality meets national standards, states in their implementation plans have to impose requirements on sources using RACT, it's called Reasonably Available Control Technology. That's one example. Another example is under the new source provisions in Subpart C of Title I of the Act. When you install a new source or substantially modify an existing source, you have to use the best available control technology. So if a source has ever been modified to a significant extent or was built after 1975, I guess, that source would have in its permit technology-based emission limitations that don't derive from Sections 7411 or 7412, but derive from Section 165, the prevention of significant deterioration requirement to have best available control technology. So that's the NSPS. No, NSPS is categorical. The prevention of significant deterioration requirements are facility-specific. So they apply whether you're making steel or making diapers. They apply if you increase your emissions beyond a certain amount. And if you do, you have to install best available control. Has this emergency defense ever been applicable to those standards? Well, I think those standards are incorporated into a Title V permit. If a facility is subject to one of those standards, they're incorporated as an applicable requirement, incorporated into the Title V permit. And so under the, at least under some interpretations of the affirmative defense, if a facility exceeded that limitation that was established in a case-by-case new source review permitting context, if it later exceeded that because of an emergency, it could assert the affirmative defense in the Title V permit. It would there? Yes. And that has not been litigated, I guess. No, and one of the things that the commenters said, including groups that are supporting this litigation, is if there's a problem, if EPA thinks that there are certain kinds of emission limitations that shouldn't be subject to an affirmative defense, then the proper thing to do is to consider whether there's a less burdensome way of addressing that instead of getting rid of the affirmative defense entirely. If EPA believes that, for example, a case-specific technology-based limit should not be subject to an affirmative defense for emergencies, that could be carved out. But EPA said, no, we're not going to even consider doing that because we're prohibited from having affirmative defense by the NRDC decision because affirmative defenses interfere with the enforcement. So EPA has foreclosed that as far as they're concerned, even with respect to these limitations coming from outside 7411, 7411. I'm sorry, I didn't understand. If I understood you, then EPA has, as far as it's concerned, already repudiated the idea of an affirmative defense to the standards that we've been discussing that do not derive directly from 7411 or 12. Yeah, it's repudiated by telling the states they can't have affirmative defense provisions and permits. Across the board. Across the board, yes, sir. And the EPA's new rationale wouldn't apply to things that are outside of Section 111 and 112 because those requirements don't necessarily have a continuity requirement. Well, I don't think EPA has addressed that specifically, and I hesitate to speak for them, but I think their position is that anything that constitutes an emission limitation, regardless of the source of that limitation, has to be continuous, and it's not continuous unless a source can be penalized if it has an emergency that causes it. But the continuous terminology derives from 111 and 112, correct? Well, the notion that a, quote, discontinuity, which is a term EPA uses but isn't used in the precedent, the notion that a discontinuity means that something is not an emission limitation, that derives from the court in the Sierra Club decision looking at Section 112, the hazardous air pollutant emission limit requirements, and the definition of emission limitations in Section 302 together, reading them together. Continuous is also in Section 302, is that right, the word continuous? Yes, Section 302 says an emission limitation is something that limits the amount of pollutants emitted on a continuous basis. And again, the reason Congress added that, and the Sierra Club court noted that in its opinion and cited to the congressional record, and it's also addressed in other cases I've recited, the reason that's in the statute is because in the early days of the Clean Air Act, before the 1977 amendments, people had said, well, this ozone pollution is only a problem in the summertime, so we're going to install controls but only use them during the summer. We don't want to waste our money on running them in the wintertime in the courts. So that's not acceptable. If you've got emission controls, they need to be used continually and not just on an intermittent or sporadic or periodic basis. I think you made the point in your brief that the EPA has recognized more than once the inherently fallible nature of the kind of equipment that's mandated. Yes, Your Honor, and in fact, even in this rule that we're challenging, EPA recognizes that. But they say, you know, nevertheless, the statute, the statute's Congress's decision, it's Congress that told us, you know, we can't recognize formally that limitation, technology based limits, because that would interfere with the district court's authority to determine appropriate penalties. And so EPA recognizes that that is a fallibility of the technology is an inherent aspect that the agencies recognize for, you know, since like the early years of the Clean Air Act. But they say they can't deal with that through the affirmative defense provision. They can only deal with it through enforcement discretion, which, of course, doesn't apply to citizen suits to enforce these provisions. We'll give you some time on the phone. Thank you. Thank you, Your Honor. May it please the court. My name is Dan Durkee, U.S. Department of Justice. With me at the council table is Michael Lee, EPA's Office of the General Counsel. I'd like to start with standing. We do think that the showings that the plaintiff has made, petitioner has made, is inadequate under the court's precedents. Notably, as the court mentioned, Twin Rivers Paper Company. Twin Rivers said basically to have late affidavits or declarations in the reply, you need to show good cause. Good cause can be if the party mistakenly, reasonably but mistakenly, believed the initial filings were sufficient to demonstrate standing, or if the party reasonably assumed it was self-evident from the record. Because the court noted there's nothing in the administrative record that mentions this party. But here, unlike in Twin Rivers, arguably here, the theory of standing is very clear. So we don't have some third party group, you know, that's incidentally affected by the regulation. These are directly regulated parties, you know, subject to Title VII, Title V permits. And so the only thing we don't have in the opening briefs is, you know, the specific facilities. But the theory of standing and the private harm to private sources is entirely self-evident. These are directly regulated parties harmed by the rule. That's true. Or arguably harmed by the rule. That's true. And as the court said, it probably would have been pretty easy for petitioner to connect the dots. The problem, I think, is that the court's precedents are pretty clear, not just Twin Rivers, Sierra Club case from 2002 that we mentioned in our brief. What about the CARE versus FAA case from 2004? That was, yeah, I think, yeah, the Communities Against Runaway Expansion, the CARE case. Yeah. Yeah. So in that case also, there were opening declarations. In that case, the court said that the supplement shored up deficient opening declarations and made standing patently obvious and irrefutable and there was no prejudice. You don't get past the first point. Petitioner could have put in a declaration, chose not to. That was their choice. It was their burden. And, of course, precedents are clear that you take that risk if you're a party. But isn't standing here patently obvious? I mean, the EPA doesn't question that a Title V permitted source would have standing. I don't know how you could challenge that. Right. That's not the problem, though, is we don't know who. And as counsel said, this litigating group is a bit of a moving target. Associations move in and out. And it's not a association or federation of individual sources that have permits. It's an association of associations. So you have to go even deeper. So isn't, I mean, the conclusion of standing here basically irrefutable? I mean, it seems irrefutable because EPA is not refuting that subsources would have standing. We wouldn't. Right. I mean, of course, it would have been better for petitioners to do a better job in, you know, giving clearer statements and pointing out, you know, some facility that was regulated. But, you know, I'm not sure how there's no standing here. I think it's not just that it would have been better, but it is contrary to the court's precedence. I think if the court makes a fine standing here, it's liberalizing standing case law by saying, if you're an association or an association of associations, if it's close enough, if we can kind of figure it out, that's good enough. And that's not what the court's precedents say. Court's precedents are fairly demanding and rigorous, whether it's 70 percent or 80 percent or whatever the percentage chance is. It's not hard, but it's rigorous. It's not hard because all they needed to say was, here's a source with a permit. But it is rigorous, and that rigor is important. A lot of these cases, though, that emphasize that rigor are about third-party standing, not about directly regulated entities that have, you know, that are the direct objects of regulation. And there is an important difference for Article III purposes between private parties that are directly regulated and associations that have members with some third-party harm. I mean, those are different conceptually. Those are, and the court's case law recognizes that typically a regulated party, the burden of standing isn't much easier than a third party. That's true. But, again, we get back to the point of we wouldn't even be having this conversation if we had a declaration that identified any one of those individual companies. And our point simply is, if the court's not going to apply the precedent as it's written in this case, it opens up a whole other line of exemptions, exceptions to what is, I think, pretty clear rules for how you plead and demonstrate standing. There's no reason to make that exception here. If the petitioners reasonably but mistakenly thought it was self-evident that they were being regulated, why isn't it sufficient that the administrative record identifies a particular entity? The problem, Your Honor, is that the administrative record has a comment letter from an association called the SSM Coalition, which seems like pretty similar, but it's not the SSM litigation group. And the declarations that they actually submitted in their reply expressly say those are different entities. For whatever reason, these companies and these trade associations created two separate entities, the coalition and the litigating group. The coalition made comments in the record. The litigating group did not. If this had been brought in the name of the coalition, they probably would have had a much better argument that, well, there's a comment letter from us in the record, so we reasonably thought that was enough. But they made that choice. So what about the Vinyl Institute? The Vinyl Institute apparently is not a member of either the coalition or the litigating group. The coalition's letter during the rulemaking identifies the members of the coalition. The Vinyl group's not in there. That's probably why the Vinyl group submitted their own comment letter, but they're not a party. It's only the one party. And, again, which reminds me, I wanted to mention that there was a question about the Florida Electric case, and counsel said, well, you know, that's what some litigating group was in the Florida Electric Power case, the SIPCOL case. Nobody questioned us there. There was dozens of parties in that case, so there was no reason to look at this party in particular. Is there any Title V permitted sources in states that don't have the affirmative defenses? Are there any Title V permitted sources in states? I actually don't know. I think the record does have a list of what states this affects. So I don't know. I could speculate, but I don't know. I don't think that specific information is in the record. It does seem at least possible that, you know, one of these 10 states that doesn't have affirmative defenses has a Title V permitted source. I mean, yeah, it seems. And if that source were to file this suit, they would not have said anything, right? Unless, I mean, potentially they could say, I'm a source, and I have a Title V permit, and it's in a state that doesn't allow the Title V affirmative defense, so what's my injury? It's hard to think. Maybe they could say, well, they'd like to have it. They'd like to apply for it. Maybe there's a way they could get a federal permit. There's other permit-issuing entities besides the state. I mean, these are friendly questions. Yeah, it's hard to say. It seems highly likely that in one of the 10 states without affirmative defense, there's some polluter that needs a Title V permit, and that source would probably not have an injury caused by the repeal of the affirmative defenses because they were in a state that didn't have the affirmative defenses to begin with. So I think that means judiciaries here need to prove more than that they are Title V sources, Title V permitted sources. They need to prove, under a summary judgment standard, that they are a Title V permitted source in a state with an affirmative defense, which is not every state. Which is not every state and is not in the declarations, as the court said earlier. It's not in the declarations and wouldn't be hard to do, to get back to Judge Rouse's point. It might be obvious. It might be indisputable if we had that information. In fact, I think if we had that information, we probably wouldn't dispute it, but we don't have that information. So why should the government, why should the court assume, why should it be upon the burden of the court if the parties don't raise standing? Why should it be the burden of the court to connect those dots? I think the case law says it's not the court's burden, it's the party's burden, and they didn't carry it. What's the difference between an emergency and a malfunction? An emergency is a type of malfunction. There's more requirements around the definition of emergency. It has to be sudden, which I think a malfunction doesn't necessarily have to be. Those are both defined terms in the regulation. So I think the parties all kind of approach this as it's a subset of a malfunction, a type of malfunction. Unpredictable malfunction? I'm sorry? Is it like an unpredictable malfunction? Well, a malfunction I think can also be unpredictable. An emergency is more of, I think emergency has a suddenness requirement, and I can pull up the definition of emergency and kind of read them side by side, but I think that's one of the words in the definition of emergency that I don't think is in a malfunction. Kind of as a practical matter, what are these sources supposed to do now? There's some act of God emergency they can't control, and as a result they emit more than they're allowed to emit, and then they get sued, if not by the EPA. I take it that some kind of organization like the Sierra Club could sue them. Do they just depend on the good graces of the court that hears that case to impose a zero penalty? What's supposed to happen then, since they haven't really done anything wrong? Well, it's not a matter of whether anybody's done anything wrong or there's a guilt component to it or anything like that, because emergencies and malfunctions kind of assume that you've taken all the steps you're supposed to take, that you're maintaining your equipment correctly. That's a problem that counsel raised and that EPA has grappled with. The inherent availability of technology is not new, and it's not something that EPA has ignored. EPA discussed in the preamble to this rule and recognized that that is a problem. That's a problem the court has grappled with. What do you hope happens there? Well, I think I would point the court to NRDC and U.S. Sugar, where the court said that essentially enforcement discretion is what Congress left. I guess there's two aspects of it. Congress left an intended enforcement discretion to be a real remedy. That may work for an EPA suit, but that wouldn't work for a Sierra Club suit. Not necessarily. I mean, any party has to weigh the merits of their discretion in not bringing litigation against polluters. Well, they have to make a decision just like anybody else. Is this a valid case? Is this a worthwhile case? Putting that aside, there's still the court. For penalties, it's still in equitable realm. It's still within the court's discretion under the statute about how much of a penalty to apply, if any. As we say in our brief, even without an affirmative defense, the source that's in this position can still make all those same arguments to the fact finder, to the ultimate decision maker. Not having an affirmative defense doesn't mean your hands are tied. It doesn't mean you can't bring to bear all of those equitable arguments. You can't describe everything you did right and how it was completely out of your control. If a polluter has done everything that could reasonably be expected of them and they nevertheless get sued for exceeding an emission limitation during an emergency, then your hope would be that the court would impose zero penalties, something like that. I would say I would leave it to the discretion of the court. I think it's going to be a fact specific. It would be a fair result in that case. If the hypothetical is that there was nothing anybody could do, there's no harm, everything was right, then if a court said, in my discretion, I'm going to apply the factors that the statute says I should apply to zero penalty, that's what Congress will allow for. Is there no provision for damages? When we're talking about affirmative defenses, usually we're talking about penalties, but there can be other relief. Potentially there could be other relief. I'm not sure about damages in the sense of monetary damages, but injunctive relief potentially depending on what the particular violation is and what the cause of action is, what the remedies are that are available. Well, if we're talking about hypothetical act of God and good faith and having done everything that one could do, it's hard to imagine there's any room for equitable relief, but there may have been monetary or monetizable, I should say, damage, correct? Well, if there's an act of God and there's an exedent and somebody's harmed and they wanted to sue for emotional distress or damages like that, I don't think that's the kind of damages in the affirmative defense that we're contemplating here. That would be a separate lawsuit. You'd have to have a cause of action against the source for that. We're talking about damages for exceeding your permit. The exedents could have adverse effects on neighbors. They could, and that could give rise to- Closes confectioner could be out of business. And that could give rise to a cause of action for the confectioner or for whoever the neighbor is. That would be, again, that'd be a fact-specific question of what cause of action you have, maybe federal, maybe not federal. About EPA's legal rationale here. So EPA concedes that its primary reason for thinking that the affirmative defense is unlawful no longer works after the Florida Electric case. Reading Florida Electric, it says that an affirmative defense is an exemption, but it says that in the context of talking about the NRDC, whether this is an appropriate, whether this infringes on the judicial power. I'm not sure that I read Florida Electric to say an affirmative defense is an exemption for all purposes, or that it's equivalent for all purposes. We're not saying that either, Your Honor. Okay. I agree with that. Florida Electric said that within the box of affirmative defenses, what's labeled as an affirmative defense, what's considered an affirmative, well, let me take a step back. An exemption and affirmative defense are different. There's real differences. An affirmative defense only applies if you're in an enforcement action and the burden of proof is on the source, and exemptions in the actual underlying- These are important legal distinctions. Right. These are important legal distinctions, but what Florida Electric said was within that box of affirmative defenses, there's two kinds. There's an affirmative defense that is only to penalty slash remedy, and there's one that's a complete defense, and the one that's a complete defense has to be analyzed the same way as an exemption in the underlying standard. Right. But even- Right. For the purposes of whether that complete affirmative defense infringes on the judicial power, it doesn't necessarily mean that a complete affirmative defense is an exemption for thinking about whether an emissions limitation is operating on a continuous basis under Sierra Club. Well, I think an affirmative defense, that's a complete defense. The reason why that's illegal is not because it's an intrusion on the judicial power. That is a separate- It's only the affirmative defense that limits remedies. That's NRDC, and Florida Electric adopted that reasoning from NRDC and said, that analysis of limiting a district court's discretion is only because you're limiting the court's ability to impose penalties. But Florida Electric went on to say that if it's a type of affirmative defense that provides a complete defense, that's functionally an exemption, and that raises different questions. And the question it raises is, is it continuous? But it doesn't answer that question. Exactly. It doesn't answer that question because the SIP context, which is what that case is, is very different. It is very different. But it doesn't answer that question. And EPA is defending the rule now, essentially, on the grounds that Sierra Club and Florida Electric legally require this result. And I don't see Florida Electric- You just said Florida Electric doesn't decide this question.  So where does that leave EPA's legal argument here? I would say Florida Electric clarifies or provides the framework for that decision, for that distinction. That's a framework of looking at opening that box of affirmative defenses and saying there's two kinds. That's what Florida Electric clarified. It's Sierra Club that provides the rule for decision, though. And that's not new. But Sierra Club provides the rule for decision for things that are actual exemptions, right? But an affirmative defense, as you said, and I agree, is maybe a complete affirmative defense is functionally an exemption, but it isn't an exemption. It's legally, importantly, different from that. And this rule, even if we think that EPA referred to the Sierra Club rationale in the alternative, it doesn't really explain how a complete affirmative defense should qualify as an exemption under the Sierra Club rationale. So at a minimum, there's no reasoning about this. I think there are a lot of open questions about that under Florida Electric. So, I mean, how does EPA, you know, support this rule, you know, which is kind of with this sort of passing reference to Sierra Club? Well, I disagree with one of the threshold points that Your Honor made about Florida Electric. I think Florida Electric has expressed and clear that if something that's structured as an affirmative defense operates as a complete exemption, legality has to be analyzed as a complete exemption. I don't think we can get around that. Florida Electric says that in the context of judicial remedies and judicial power under NRDC. It doesn't say that for the purposes of continuity under, you know, Sierra Club. And they might well be different because of what we've already discussed, which is that affirmative actions and exemptions are legally different concepts. So that would at least seem to be something that EPA would have to consider, you know, take comments on, provide explanations for. I mean, especially given EPA's longstanding position that affirmative defenses and exemptions are distinct and should be thought of as distinct. Well, before I answer that, let me say one more thing about Florida Electric and I want to say that I respectfully disagree with that reading of Florida Electric. The Florida Electric opinion... I was waiting for you to say that. The Florida Electric opinion did not get to NRDC and the limits on remedial discretion until after it already exhaustively analyzed a complete defense. So I don't think Florida Electric stands for the proposition that an affirmative defense, even if it's complete, still implicates NRDC and remedial power. I think Florida Electric stands for that. Well, it doesn't implicate NRDC, but I think EPA, my understanding is, you're making an affirmative argument that now we have to think of affirmative defenses as exemptions for Sierra Club purposes. Well, not all affirmative defenses. Not all affirmative, but these affirmative defenses. Yes. And that isn't what... I mean, the court just didn't say anything about that in Florida Electric. Well, the court didn't reach a conclusion, but it did say something about it. It said, how do you analyze it? And it referred back to the earlier part of that opinion where it delved very deeply into the legality of a complete exemption. And what the court described the question to be answered is whether it has to be continuous. And the court said, we don't have to reach that question because it only has to be continuous if it's an emission limitation and because it's a SIP, it's not necessarily, it doesn't necessarily require an emission limitation. That's the decisional, that's the path. Here, we plug that path into here. Well, it's the type of affirmative defense that's a complete exemption. It does, unlike in the SIP context, in the Title V contract, it does necessarily include emission limitations. You don't have that ambiguity of it's an emission limitation or maybe a other condition. It has to be an emission limitation. Judge Ginsburg asked earlier whether the Title V permits include things that are also not emissions limitations. So eliminating the affirmative defense for those is not necessarily, there's no reason for that necessarily in EPA's rule. I mean, there isn't because they, you know, EPA didn't really flesh out. Well, to go to that point, yes. The Title V permit has to include all applicable requirements and not all of those are technology-based emission limitations. But what I think petitioners are trying to say is, well, you could conceivably carve out everything else and leave that as an affirmative defense. But that's not what was before EPA. EPA has an affirmative defense that is too broad. It is, in our view, undisputably too broad because it pulls in 7412 technology-based emission limitations, 7411 technology-based emission limitations. Those cannot have affirmative defenses. So as written, it's too broad. It had to go. The rule gets rid of all affirmative defenses, which arguably is unreasoned if it's not supported on the Sierra Club rationale. Well, I disagree with that. I think it is reasoned because EPA did explain, did explain the Sierra Club rationale. So I guess two points. The Sierra Club rationale doesn't apply to the other types of limitations that aren't technology-based emissions limitations. On its face, Sierra Club dealt with a 7412D standard, but it was not based on an interpretation of 7412D. It was based on 7412D plus the definition that your court mentioned in 302K, 7602K. It defines an emission limitation. That definition applies to all emission limitations, regardless of the source of the Clean Air Act. It doesn't have to be 7412. Are there any emissions limitations in a Title V permit that are not also subject to the 302 continuous basis requirement? Well, if it's an emission limitation, that's a defined term. Now, there can be other conditions. Other conditions. Sure. That are not subject to 302. There can be other conditions. There can be other restrictions, let's say. Kind of like, again, the SIP context where the court was grappling with that is, well, an emission limitation is not the only way to restrict emissions. That's true. And a Title V permit is designed to collect everything that a source has to comply with. That's the whole reason you have a Title V permit. But EPA wasn't faced here with a request to try and craft a new, more narrow affirmative defense. It was faced with the question of, is the affirmative defense as written legal? And because, and at a minimum, because it includes 7412P and 7411 standards, it's illegal. Now, there's a separate question. Could EPA have crafted, or could EPA today craft, a narrower affirmative defense? And I would say, actually, the answer is no. Because Title V is not designed to impose substantive, restrict substantive standards. Title V is designed to collect them. So if EPA, if a company, if our Title V source in Topeka said, we want you to give us a narrower legal affirmative defense, the way to do that would be in the underlying standards, not in the Title V permit. And that was the context of Sierra Club. Sierra Club was a rulemaking under 7412D where EPA gave an exemption. And the court said, well, you can't do that. This is one step removed from that. This is trying to give an exemption in a Title V permit. And that's why, to Judge Walker, your question earlier about what you thought might be the best ways for them to win is to show that the general duty in Sierra Club is somehow different than the general duty about excess emissions here. Even if you could slice that, which I don't think you can, even if you could slice that, there's another problem, which is Sierra Club was, again, a standard setting rule. In a Title V rule, EPA doesn't have the authority to impose or change emission limitations or standards or restrictions. It'd have to do that in the underlying rule that established those requirements. So even if there were some daylight between those two general duties, we'd say it'd still be illegal for EPA in a Title V permit to give an affirmative defense that narrowly just looks at non-emission standards, because Title V doesn't give EPA that authority. We're not reviewing the Title V permits. We're reviewing a rule that sets standards for Title V permits generally. Or that's the underlying rule that EPA tried to listen. Right. So acting under Title V, EPA can only do what the Title V of the Clean Air Act, that part of the statute, allows it to do. And we cited in our brief, I think it's the UARG case, which I think was a Supreme Court, which said Title V is not designed to impose any substantive standards. It's designed to collect them. So one of the things petitioners are asking for, and part of the back and forth is, well, could EPA craft a narrower affirmative defense? If it could do that, it would have to be in a 7412 rulemaking or in a SIP. Well, EPA wouldn't do a SIP. It would be a Federal Implementation Plan or some other substantive rulemaking, not using Title V of the Clean Air Act, because Title V of the Clean Air Act does not give EPA that authority. I just had one other question. Could an affirmative defense be a work practice standard Well, a work practice standard could be, a work practice standard is a kind of restriction, right? And one of the things petitioners are saying is the conditions of the affirmative defense that you have to do X, Y, and Z amounts to a work practice. Again, that argument, to the extent it has any legs, would have to be, EPA would have to apply that in the actual 7411 or 7412, whatever substantive standard, and look at, well, what are the sources? What are the pollutants? What's the particular standard we're talking about? And does that work practice standard make sense? If you could have a work practice standard that said, like, during an emergency, you can take all reasonable steps or whatever it is, that couldn't be done in the Title V context, Title V rulemaking. You'd have to do it under a 111, 112 rulemaking. Right, if you can do it at all. If you could do it at all, it would have to be in that context. If you could do it, right, you'd have to, right. And if you did it as an affirmative defense, there might be other problems, but... But if you did it as a separate standard... Exactly, if you did it when you're setting this, when you're defining what is the standard, if you say, well, under these operating conditions, we're going to say the standard is X, and under these operations, we're going to say it's Y, and it's continuous, there's always a standard in place, they're different, but it's still continuous. That's something that EPA might be able to do in that context. It certainly can't do it here. And, of course, that's not this case, whether EPA could, in fact, get over the humps to do that, but that would be the context where the question should really be joined. Putting aside whether affirmative defenses make an emissions limitation not continuous, are there any Title V permits that don't have continuous emission limitations? Well, there shouldn't be any that don't have continuous emission limitations, because any emission limitation... Are there any that don't have emission limitations? There could be. Theoretically, there could be. I'm not aware of any. I don't think EPA is aware of any, but a Title V permit only, in quotes, only includes applicable requirements. I say only, in quotes, because that's pretty broad. Applicable requirements is pretty broad. If there could be a Title V permit that does not have an emissions limitation, then that Title V permit would lawfully be allowed to have an affirmative defense, because that affirmative defense would not be an elimination of an emissions limitation. The emissions limitation is already not there. Right. It's hard to imagine the source that that would have that kind of permit, because applicable requirements, the way it's written, if you're a major source and you're emitting, say, out of a smokestack, yes, theoretically, you could... It is conceivable. It's hard to imagine in practical terms what that source would be, and EPA is not aware of any permits that actually fit that. But if you had that, kind of a shell permit, essentially, then, yeah, that's true, because it's our whole argument. Why is that not the answer to this case? Because in Florida Electric, the SIPs, you can imagine a SIP that did not have an emission limitation. Therefore, if those SIPs had an affirmative defense, that was fine, because those SIPs weren't required to have an emission limitation. Here, you just said you could imagine a Title V permit that doesn't have an emission limitation. So, for those Title V permits, fine. They can have affirmative defenses, because those affirmative defenses are not nullifying the emission limitation that's already not a requirement. The reason that doesn't answer the question here is because the affirmative defense here is expressly limited to emission limitations. So, if you had that other hypothetical, you wouldn't even be under this regulation anyway. This regulation is expressly limited to emission limitations. If you have an emission limitation, it has to be in your permit. Okay. So, I think the very last thing you said there is the answer. If you have an emission limitation, it either has to be in your permit, or you don't get the permit. I mean, it has to be in your permit. Yeah, it has to be in your permit. And that's the difference between this case and Florida Electric. That's exactly right, because Florida Electric, the way the SIP statute was written was subtly, but importantly, different. It allowed for a SIP to have a different kind of restriction. I guess I'm still not totally sure, because you said if you have an emission limitation, it has to be in your permit. But an emission limitation with an affirmative defense is, let's say, not an emission limitation. And if that thing, whatever we call it, is all that's required to be in your Title V permit, then your Title V permit is fine. Your Title V permit is fine, and you don't get to the affirmative defense. You define the statute situation outside the affirmative defense. Now, the affirmative defense only applies if the Title V permit has an emission limitation. And if you're in that world, the emission limitation has to be continuous. You can't have this continuity created by the affirmative defense. If you're outside that world, sure, that's more like the SIP context. But that's not what the regulation says. So the affirmative defense here only applies to emission limitations. Yeah, that's... The Title V permit, more broadly, may have other conditions, but the affirmative defense doesn't apply to them. That's right. And that's, yeah, the affirmative defense... I can pull up the actual language. That's the definition of affirmative defense. That's the definite emergency. It's 70.61. Let me turn that, because that's in the... It's in the addendum at... I think that's... Yeah, effective emergency. I think it's in the addendum. It's in the addendum at 2. I think it's at 79. Effective emergency. An emergency consists of... An emergency constitutes an affirmative defense to an action brought for noncompliance with such technology-based emission limitations. Now, if it's just, you know, it's an affirmative defense to whatever in your permit. How do we know that the Title V affirmative defense doesn't apply to the SIP, kind of pseudo-emission? Well, so a SIP is a source of emission restrictions, and those, as we've learned, as Floor Electric teaches, those can be technology-based emission limitations or they can be audit restrictions. To the extent the SIP imposes on a source, a emission limitation, that triggered the regulation that allowed for the affirmative defense. And we say that's illegal. If the SIP brings in other... If the Title V permit brings in other SIP-based requirements that are not emission limitations, this regulation didn't have any effect. The affirmative defense just doesn't apply. It just doesn't apply. I think I got it. Yeah. I have one practical question. How often are these emergencies, and what's the potential liability? Well, I don't know what the potential liability is, like in terms of dollars or things like that. I just don't know. How often they are, I have to say, I also don't know. And the reason is that EPA doesn't issue most permits. Most permits are issued by states, by tribes, by local authorities. EPA just... They're not in EPA. Yeah, they're not in EPA. So what EPA did was in the preamble said, we think this affirmative defense is rarely used. Please comment. And nobody said anything. And so that's why in our brief we say, well, it seems to be rarely used. I don't want to overstate that because, I mean, it's possible, and I think petitioners... It might not bring civil suits because the affirmative defense is in the rule. Exactly. It could have other... And petitioners talk about that, too, that there are other effects of having that affirmative defense on the books. So as far as standing... As far as EPA knows, yeah, that's still true. It's rarely used. Okay. Okay. Okay. If there are no other questions, the petition should be dismissed based on standing or denied on the merits. Thank you. Mr. Pry will give you two minutes on rebuttal. Thank you. Mr. Durkee describes a body of precedent that makes very clear what is required to demonstrate standing in a situation such as this. That's not at all the case. This court, in many decisions, including the American Library Association's case, talks about how confused the precedent is and how it's understandable that facilities would not necessarily expect the court to believe that standing was not self-evident. That case also, by the way, is one of the ones that talks about how it is one reason not to require a bunch of... One reason that the case law, including the Sierra Club decision that we've been talking about, talks about the standing of regulated parties normally being self-evident is that otherwise applying what they call the gotcha approach to say, well, if you guess wrong about whether it's self-evident, then your otherwise meritorious petition will be dismissed. That would have the undesirable effect of causing parties to include long jurisdictional statements and practically all opening briefs, et cetera. So that point is made clearly in that case. I guess I urge the court to take a practical approach, really, to all the issues that we're talking about here. There's no question, just as in the American Trucking case that we cited, that an organization specifically formed to address these particular kinds of EPA regulations because of their effects on industrial facilities is in a position to present a case for controversy and fully address the merits, and it wouldn't serve justice or any real purpose to dismiss these claims and not consider them based on an unclear, at least, requirement. Judge Walker, you talked about needing to identify specific facilities and that Mr. Hunt's declaration wasn't specific because it just said there are members of the American Forest and Paper Association who have facilities in these states who are affected by, have affirmative defense provisions that they would lose as a result of this action, but that wasn't sufficient. You had to say which facility in which state. Mr. Durkee doesn't suggest it's that much of a requirement. They say we need to know the name of one of the members. Well, that doesn't really do anything more than knowing the purpose of the organization and the fact that this is a rule that applies very broadly and it's not being challenged by somebody other than representatives of the facilities that are directly affected. Mr. Crow, let me just see if my slides have any others. I was just going to ask the question I asked your present counsel at the end. Do you have a sense of how often these emergencies happen and what kind of liability might be faced by your clients, whoever your clients are? That is something that's addressed in the record and in parts of the record that we cited where people in their comments said, you know, this is a real problem. We do have these emergencies. They're unavoidable and so forth. The penalties available under the statute quickly run into hundreds of thousands of dollars. That point is made in Mr. Hunt's declaration also. Is your point that these may be low occurrence but high liability when they do occur? Yes, and the other point that was discussed is because an affirmative defense exists, just because EPA can't point to all the instances where it's been successfully exercised, that doesn't mean it hasn't had its desirable effect. Namely, EPA or citizen plaintiffs wouldn't bring an action if they knew that the facility, that the emissions that are in question resulted from an emergency were unavoidable, were not something the facility should be blamed for, and therefore an affirmative defense could be successfully exercised, and therefore it served its purpose. Thank you, Mr. Price. Thank you. Thank you for submitting.
judges: Rao; Walker; Ginsburg